NOT RECOMMENDED FOR PUBLICATION
File Name: 05a0172n.06
Filed: March 4, 2005

NOS. 03-1786/1790/1906/1908

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff-Appellee/Cross-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| DANTE HOWARD, DIANE STOKES, and | ) | |
| SHELLY DAVIS, | ) | |
| | ) | |
| | ) | |
| Defendants-Appellants/Cross-Appellees | ) | |

_____

BEFORE: BOGGS, Chief Judge, DAUGHTREY, Circuit Judge, and WISEMAN,[*] District Judge.

**PER CURIAM.** The defendants, Shelly Davis, Dante Howard, and Diane Stokes, were convicted by a jury of conspiracy to distribute heroin. Davis was also convicted of maintaining a drug house. Howard now appeals his conviction, arguing that the district court erred in "compelling" a governmental witness to testify without statutory immunity and in allowing a heroin addict who formerly had an "extreme addiction" to testify. Stokes likewise appeals her conviction, arguing that the district court erred in admitting audio tapes

_____

[*]The Hon. Thomas A. Wiseman, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

of her conversations with a government informant. Stokes and Howard also appeal their sentences: Stokes argues that the district court erred in sentencing her based on 700-1000 grams of heroin, and Howard contends that the district court erred in granting him a four-level enhancement for being a leader or organizer of the conspiracy. Finally, the United States cross-appeals Davis's sentencing order, arguing that the district court erred in granting her a 12-month downward departure for a state sentence she had previously served. Although we find no reversible error in connection with the defendants' convictions, we conclude in light of the Supreme Court's recent decision in *United States v. Booker*, 543 U.S. ___, 125 S.Ct. 738 (2005), that the sentences imposed on Howard and Stokes must be vacated and their cases remanded for re-sentencing. In addition, we find merit to the government's appeal challenging Davis's sentence, and we therefore vacate her sentence and remand her case as well.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In August 2002, defendants Davis, Howard, and Stokes, together with Darnell Barber and Shawn Echols, were indicted for conspiring to distribute heroin over a six-year period from 1996 to the date of the indictment. Davis and Howard were also charged with maintaining a drug house at 615 McAlister Street in Benton Harbor, Michigan.

One of the government's principal witnesses at the trial was John Turner-Bey, who both aided the conspiracy and bought drugs from some of the defendants. When Turner-Bey's testimony contradicted his grand jury testimony, the prosecutor confronted him with his grand jury testimony. After this happened a few times, Turney-Bey stated, "I also recall,

at the grand jury, they said my statement would not be used against me . . . . I don't like this here. I'm being tricked, and I don't like it." The court told him he was not being charged with a crime and that his testimony could not be used against him in any court of law. The prosecutor subsequently asked Turner-Bey whether anyone had contacted him recently about the case, and he answered that Shawn Doe, which was a pseudonym for defendant Shawn Echols, had come to see him. Turner-Bey said that he feared for his life, although he later denied that he was changing his testimony because of contact with Echols. Turner-Bey then continued testifying but, after being confronted with more of his grand jury testimony, asked whether he could "plead the fifth." The court responded that he could not because he had been given immunity regarding his testimony. At a side bar conference, the defense counsel asserted that Turner-Bey had been given only "pocket immunity," not statutory immunity. The court then explained to Turner-Bey that he could possibly be prosecuted by the state for perjury and asked him whether he wanted to continue with his testimony. Turner-Bey responded that he wanted an attorney, and the court appointed counsel for him. The next day, the lawyer explained his understanding that the immunity Turner-Bey received was the equivalent of formal immunity and indicated that Turner-Bey wanted to finish his testimony without insisting on formal immunity. Turner-Bey testified that he had been the doorman at a drug house run by Howard and that he had purchased heroin from Barber and Stokes.

Another of the primary witnesses at the trial was Billie Jean Brooks. According to her testimony, Brooks was a heroin addict who, until August of that year, had used up to ten "bags" of heroin daily. Brooks testified that she had purchased heroin from Howard for

- 3 -

use and resale, estimating that since 1995, she had received altogether as much as a kilogram of heroin from Howard. Brooks also testified that "for a long time" she obtained heroin from the house on McAlister Street, usually purchasing the heroin from Barber, but sometimes receiving it from Stokes.

In addition, Brooks testified about controlled drug purchases that she had made at the McAlister Street house. For example, on July 11, 2002, she bought two grams of heroin from Barber and a gram of cocaine from Davis. Stokes was present during the transaction. On July 19, 2002, Brooks called the McAlister Street house and spoke to Stokes, who told her that "he's off on the money" and "it's here," which Brooks understood to mean that there was heroin at the house. Brooks went to the McAlister Street house and entered a back bedroom with Stokes, Barber, and Davis's grandson. She obtained two grams of heroin from Barber and two grams of cocaine from Stokes. At trial, tape-recordings of the July 19 telephone conversation and drug transaction were played, as were tapes from other controlled buys.

At the conclusion of the government's case, the court granted Howard's motion to dismiss the second count against him. The court also determined that "no reasonable jury could find that Defendants Diane Stokes, Shelley Davis or Darnell Barber could have reasonably foreseen the conspiracy in which they may have participated involved more than 100 grams of [heroin]." The court elaborated:

> I suspect, quite frankly, that the people knew that the conspiracy was broader, and I think that a reasonable jury could probably find by a preponderance of the evidence that the individual participants were involved in a conspiracy greater than the threshold numbers of 100 and 1,000. And

- 4 -

maybe I'll make that decision at the time of sentencing. This does not bind me at the time of sentencing. But I do not think that the reasonable jury could make that finding beyond a reasonable doubt based upon the evidence presented at this time.

The court therefore granted the defendants' motions to dismiss as to the quantity element.

The jury found Howard, Davis, Barber, and Stokes guilty of conspiring to distribute heroin, with Howard being found accountable for 1000 grams or more of heroin. Davis was also found guilty of maintaining a drug house at 615 McAlister Street.

At sentencing, the district court increased Howard's offense level, based on his leadership role in the conspiracy, resulting in a sentence of 202 months in prison. Barber stipulated to being accountable for 700-1000 grams of heroin and was sentenced to 120 months custody. He does not appeal his conviction or sentence. The district court decided that Stokes should also be found accountable for 700-1000 grams of heroin, pointing out that one witness, Justin Brown, testified that he bought four to five grams of heroin per day for several months from Stokes and Barber and calculating that Stokes and Barber had sold Brown 120 grams/month over a period of at least seven months. The court also noted Brown's testimony that there were some 20 customers a day at Stokes's and Barber's house and found it "clear" that drugs were sold by Barber and Stokes at other times as well. The court observed that it "defies logic and common sense to believe that Ms. Stokes was dealing just in the discrete times that were mentioned by the direct testimony" and concluded that "both Ms. Stokes and Mr. Barber were major drug dealers in Benton Harbor and [that] finding them responsible for at least 700 grams of heroin is a very conservative estimate as to the amount of drugs for which they should be held responsible." After

granting her a reduction for playing only a minor role in the conspiracy, the court sentenced Stokes to 78 months.

The district court found Davis responsible for nine grams of heroin and 23.25 grams of cocaine, imposing an initial sentence of 33 months but then granting a downward departure of 12 months for a state sentence that she had served for a conviction involving the delivery of less than one gram of heroin in 1996, at the beginning of the conspiracy charged in the federal prosecution.

On appeal, Howard challenges both his conviction and his sentence, contending that the district court erred in permitting Brooks to testify, in its treatment of Turner-Bey's immunity, and in giving him a four-point enhancement for his role in the offense. Stokes also appeals both her conviction and her sentence, asserting that the district court erred in admitting the audio tapes of her conversations with Brooks and in finding her responsible for 700-1000 grams of heroin. The government appeals Davis's sentence, contending that the district court erred in granting the 12-month downward departure.

## II. DISCUSSION

### A. Alleged Errors at Trial

Howard argues that John Turner-Bey was improperly compelled to testify without the benefit of statutory immunity, that his testimony was therefore tainted, and that Howard should therefore be granted a new trial. However, the privilege against self-incrimination is a personal one, *see United States v. White*, 322 U.S. 694, 699 (1944), and, thus, Howard has no standing to bring a claim on Turner-Bey's behalf. *See United States v. Hathaway*,

534 F.2d 386, 402 (1st Cir. 1976) ("[D]efendants are without standing to contest the legal sufficiency of the granting of immunity by the Government to [government] witnesses.").

Howard also contends that the district court erred in allowing Billie Jean Brooks to testify, given her testimony she had had an "extreme" heroin habit. Howard argues that because of her high level of drug use at the time of the events about which she was testifying, Brooks was unable to satisfy the "personal knowledge" requirement of Federal Rule of Evidence 602. But because Howard did not object to Brooks's testimony at trial, this court reviews the district court's admission of the testimony for plain error. *See United States v. Henley*, 360 F.3d 509, 518 (6th Cir. 2004).

According to Federal Rule of Evidence 602, a "witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." We have recognized that "an argument can . . . be constructed that a person might be impaired to the point that he would not be able to satisfy the 'personal knowledge' requirement of Rule 602." *United States v. Ramirez*, 871 F.2d 582, 584 (6th Cir. 1989). However, we have also noted that "the threshold of Rule 602 is low" and held that "[t]estimony should not be excluded for lack of personal knowledge unless no reasonable juror could believe that the witness had the ability and opportunity to perceive the event that he testifies about." *United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990).

As defendant Howard points out, there were some inconsistencies in Brooks's testimony, but they were clearly not so substantial that no reasonable juror could have believed that Brooks had the ability and opportunity to perceive the events that she testified

about.   Significantly, the district judge found Brooks's testimony believable, remarking during the sentencing hearing that "she might not have appeared credible to some of the lawyers, but she appeared credible to me." Furthermore, as the government notes, some of Brooks's testimony – specifically the testimony that concerned the controlled buys she made in the summer of 2002 – was corroborated by tape-recordings of the transactions. We conclude that the district court did not commit plain error in allowing Brooks to testify.

Defendant Stokes argues that the district court erred in admitting the audio-tapes of her telephone conversation and in-person conversation with Brooks.  She asserts that the tapes were unreliable because of the high level of background noise and overall inaudibility of the voices.  She also contends that the district court did not sufficiently validate the accuracy of the transcripts that were used in connection with the tapes.  The district court found, with regard to the telephone conversation, that "the tape and the transcription are accurate and complete." With regard to the in-person conversation, the district court judge noted:

> I think that this tape is sufficiently audible and comprehensible for the jury to consider its contents.  It becomes a lot less audible when you get to the part that's at page 5 of the typewritten transcription.  As a matter of fact, it says it in there.  By that time, most of the conversation is completed, and the transcription is quite accurate as to those parts you can understand.  The attributions I don't have a clue about.  That's a matter of proof.  So that tape can be admitted subject to identifying, once again – and the transcription can be used subject to the government identifying the people.

We review both a district court's decision to admit tape recordings and its decision to allow the use of transcripts of recorded communications for abuse of discretion.  *See*

*United States v. Wilkinson*, 53 F.3d 757, 761 (6th Cir. 1995). Given the facts in this record, we find no abuse of discretion by the district judge.

## B. Alleged Errors at Sentencing

Defendant Stokes argues that the district court erred in sentencing her based on over 700 grams of heroin. She contends that it was Barber, not she, who was involved in the heroin-related transactions and argues that she should not be held responsible for the drugs that Barber sold simply because she was present during the drug sales or resided at the location where the drugs were sold. She asserts that the total quantity of drugs sold by her during the specific instances mentioned in the pre-sentence report was only 27.868 grams of heroin and 34.8 grams of heroin and that her offense level should have been determined based on those quantities.

As noted above, at the close of the government's case, the court determined that "no reasonable jury could find that Defendants Diane Stokes, Shelley Davis or Darnell Barber could have reasonably foreseen the conspiracy in which they may have participated involved more than 100 grams" of heroin. In sentencing Stokes, under a mandatory regime, for an amount greater than that, the district court clearly erred under the Court's *Booker* analysis, and Stokes is therefore entitled to a new sentencing hearing.

Defendant Howard's base offense level of 32 was increased to 36, based on a four-level enhancement for his role as an organizer of the conspiracy. He also received a three-level reduction for substantial assistance, resulting in guideline range of 188-235 months. The enhancement violates *Booker*, however, because the jury did not render a verdict on the question of his role in the drug conspiracy, nor did he admit to being a leader of the

conspiracy. Without the four-level enhancement, his guideline range would have been 121-151 months. Because Howard received, under a mandatory regime, a sentence above the maximum sentence he could have received based solely on the jury verdict or his own admissions, he is likewise entitled to a remand for re-sentencing.

## C. The Government Cross-Appeal

The government's challenge to Davis's sentence is based on the district court's decision to grant her a 12-month downward departure for time served on a state conviction for possession with intent to deliver heroin that grew out of an arrest by local authorities at the McAlister Street residence in June 1996. At that time, Davis was sentenced to an indefinite term of 15 months to 20 years but served only one year in state prison. The district judge granted the departure pursuant to U.S.S.G. § 5G1.3, application note 7 (2002), which at the time read: "In the case of a discharged term of imprisonment, a downward departure is not prohibited if subsection (b) would have applied to that term of imprisonment had the term been undischarged. Any such departure should be fashioned to achieve a reasonable punishment for the instant offense." U.S.S.G. § 5G1.3(b) (2002), referenced in application note 7, read in pertinent part: "[If] the undischarged term of imprisonment resulted from offense(s) that have been fully taken into account in the determination of the offense level for the instant offense, the sentence for the instant offense shall be imposed to run concurrently to the undischarged term of imprisonment."

Davis asserts that the discharged term of imprisonment was "fully taken into account in the determination of the offense level for the instant offense" because the charges in the instant case encompassed the drug raid that resulted in her 1996 state conviction. She

points out that the government presented evidence about that raid at her federal trial and argues that the government chose to draw the charges broadly and present evidence going all the way back to 1996, thereby laying the legal basis for the downward departure. She asserts that the district court's determination of the drug quantity for which she was responsible included the drugs seized in the 1996 raid, for which she had already been convicted in state court, and contends that the district court was correct in granting her the downward departure under § 5G1.3, which "operates to mitigate the possibility that the fortuity of two separate prosecutions will grossly increase a defendant's sentence." *Witte v. United States*, 515 U.S. 389, 405 (1995).

In response, the government contends that the district court did not take the drugs seized in the 1996 search into account in determining the drug quantity for which Davis was responsible. In point of fact, it is not entirely clear from the district judge's statements at sentencing whether or not he included those drugs in determining the drug quantity for which Davis should be held accountable. On one hand, before calculating the amount attributable to Davis for sentencing purposes, the judge did state that "in 1996, a search of the residence produced cocaine and heroin." On the other hand, in explaining why he was holding her accountable for nine grams of heroin and 23.25 grams of cocaine, the judge never actually mentioned the .268 grams of heroin and 5.311 grams of cocaine seized in the 1996 search. Moreover, as the government notes, Davis would have had the same base offense level and federal sentencing range whether or not the 1996 drugs were included in the drug quantity determination. The government further notes that the rationale of § 5G1.3 is to avoid double punishment for the same conduct and that someone

cannot be considered to have been punished twice for the same conduct when inclusion of that conduct in the sentencing calculation had no effect on the result. We agree, and for this reason find that the 12-month downward departure was unwarranted under § 5G1.3(b). The sentence imposed on Davis by the district court, like those of the other two defendants, must therefore be vacated and her case remanded for re-sentencing without benefit of the 12-month departure, and without treating the correct guideline range as mandatory.

### III. CONCLUSION

For the reasons set out above, we AFFIRM the district court's judgment of conviction as to each of these defendants but VACATE the sentencing orders contained in that judgment and REMAND their cases to the district court for re-sentencing in conformity with this opinion.